Bishop, Case No. 19-4112. And going for the appellant is Ms. Stevenson. You may proceed when you're ready. Good morning. Thank you and may it please the Court. I'm Shannon Stevenson on behalf of the appellants, Estanza and Jim Sweet. Your Honors, in granting summary judgment in this case, the District Court erred by placing on Estanza burdens far higher than any imposed by Utah law. With respect to improper means, the District Court required that Estanza provide evidence of a written or published industry standard, but Utah has no such requirement. Here, Estanza had three highly qualified experts representing each different player in the FF&E industry that testified that it is the custom and practice of the industry for parties not to threaten or pressure other parties to breach sales rep agreements. They also explained why this standard is not anti-competitive but pro-competitive. This was more than sufficient to clear the hurdle of summary judgment. And with respect to lost profits, the Court required Estanza to identify and substantiate costs that the District Court itself described as miniscule. This burden far exceeded Utah's well-established test that lost profits must be proven with reasonable certainty, not mathematical precision. And I'll start with the issue of improper means. In its post-trial order, the District Court said that although it had not initially addressed the improper means issue on summary judgment, it found that Estanza would have lost on that issue anyway and used it as a basis for denying the post-trial motion. And the Court believed to appear that the industry standard articulated by the experts in this case was not objective because it had not been written or published. But Utah doesn't have any requirement that an order to be enforceable. In fact, in the recent... And isn't that undisputed? Doesn't counsel agree with you on that point? That it need not be published? I'm not sure about that, Your Honor. I do think they think that the concept of objectiveness requires some sort of written or published standard in order that folks in the industry know about it. But again, Utah has specifically said that you may establish that standard and that people in the industry know about it through expert testimony. Now, with respect to the requirement, external and objective, I think the District Court just misunderstood what that meant. And again, this is a criteria that has been thoroughly addressed in Utah law in the Swift and the Walker cases. And it simply means that the standard is not internal or subjective to one particular participant in the industry. Now, those cases are Court of Appeals cases? Swift, Your Honor, is Utah Supreme Court. And it's... Is that the C.R. England case? Correct. Correct. In that case, they don't really apply the standard, right? No, it was on a certified question. And so they're just discussing the law, but they thoroughly and emphatically endorsed the Walker standard, which specifically says that external and objective only means that it's industry-wide, not just subjective or internal to one particular player in the industry. And that was the precise issue presented in the Walker case. And again, there's no suggestion that that is a problem here. Again, we had three expert witnesses, one representing manufacturers, one representing purchasers, and one representing sales representatives, who all confirmed that this was the standard throughout the industry, that it is not unique to any particular participant in the industry. Let me address... The Church raises an argument that it's not sufficient to show an industry standard that prohibits interference with contracts, that there somehow must be something more than that. The Church does not cite any cases to support that notion. It wasn't the basis for the district court's ruling in this case. And of course, the Utah Supreme Court has specifically identified an industry standard is the thing, is the more factor that you can show that will establish an improper means where there's interference with a contract like there was here. And the final thing I want to emphasize on with respect to industry standard is one of the things that courts worry about is whether with improper interference, that there's going to be a disruption of competition. But this industry standard is, as the experts testified, pro-competitive, not anti-competitive. Well, and here, it seems to me, it's a standard that doesn't fit the parties we have in front of us. These are not competitors. Exactly, Your Honor. Estanza is not a competitor of the Church. And the reason why the whole industry recognizes the standard of not interfering with sales rep agreements is because it benefits both purchasers and manufacturers. So worldwide industry, and without this experienced and knowledgeable body of sales representatives, there would be a real hardship on smaller manufacturers or purchasers who don't have in-house sales reps to make the connections and find partnerships around the world. And the sales reps enable this on both sides. That's why everybody in the industry recognizes and supports it. Weren't the experts, though, they weren't totally on the same page, were they? Weren't the standards being advocated from the three experts a little bit different from witness to witness? Your Honor, I disagree with that. I think they were remarkably consistent. Each of them basically testified, look, you are free as a participant in the industry, a purchaser, to attempt to negotiate things like price or how you're going to interact with a manufacturer. What you cannot do is condition your business, threaten to take away or promise more business, condition that on the elimination of a sales representative. And that is precisely the conduct that was it issued here. I want to just, this is how the district court itself described the conduct. It said, Mr. Finlinson threatened that unless Francesco Milan eliminated Mr. Sweet, the church would not purchase any furniture from Francesco Milan for its Rome temple. And the exact same conduct with respect to the other manufacturer. So this conduct that the district court describes is dead in the, right in the center of what these experts have described as the industry standard or breaching the industry standard. Now, I think with any industry standard, you could come up with hypotheticals where there might be some gray area, no matter how written or published or anything that it is. And to the extent there was any tiny disagreement among the experts, it might be in these sort of hypothetical scenarios. But that's just an issue of credibility. And I want to highlight the fact that the church has acknowledged that the question of whether there's an industry standard is a question of fact. That's at page 950 of the appendix and the summary judgment oral argument where the church acknowledged this was an issue of fact. And to the extent, you know, someone wants to quibble about some hypothetical example of whether this is or isn't within the industry standard that goes straight to credibility. And that would be an issue for the jury. Oh, Judge Carson, I think you're talking, but you're on mute. Sorry, I didn't want to shuffle papers and make noise over here. So, here's where I'm having a bit of difficulty, and maybe you can help me out. So, it seems to me that your position is a little bit circular. The argument is that you have a case based on someone using improper means to induce a breach. And so, to prove improper means, you go get experts who say, in this industry, it's the custom or industry standard that people in the industry don't use improper means to induce breaches of contracts. And it just seems to me that, I mean, you could undo every case could be an improper means case in that instance because you could always go get someone to say, hey, we're an ethical industry. We don't do that. It's a practice in this industry that we don't induce breaches. How do you deal with that? Well, Your Honor, I first, I think, disagree with your premise that you could find in any industry experts willing to say we have a standard and custom and practice in this industry that we don't interfere with a particular type of contract. And I think that's what makes this case different. This isn't just saying, you know, we have a standard where I, as a competitor, don't go try to take away my other competitor's business. That's the kind of conduct that we want to allow. We want competitors to be able to try to steal each other's customers away. But this is an entirely different type of case. This is where, again, and I think it's critical here that each different player in the industry confirms this industry standard. I don't think any customer in a normal industry would say, I don't want people competing for my business, including if it means breaching their own contracts. You know, that would be a typical competitive industry type of evidence you would hear. But here, everybody agrees this standard is important and it's pro-competitive because having these folks, these sales representatives available to do this work is essential to our ability to find each other as business partners. And I think that's what takes this out of the scenario that you have described, which is what the courts are trying to avoid. And so again, the uniqueness here is that the standard is pro-competitive. And again, we do have expert testimony from every participant in this industry describing that this is, in fact, the industry-wide standard. I'd like to get back to the issue that I think is probably more premier, and that is the issue of costs and the lack of proof of costs. Because that is really the basis upon which the court ruled. I agree, Your Honor. And just what the district court said, he said that Estanza had presented no evidence of costs. And that is simply not the case. Estanza presented evidence that it was a home-based professional service commission business, that it had no lease, no employees, no storage costs, no shipping costs. Mr. Sweet testified that he did have a home office with overhead, but that all of that overhead would continue to be incurred, regardless of the church's interference. And then to the extent he had any travel costs that could be allocated to the church for, and this again, we'll be talking about prospective travel, those costs would be de minimis. Now, all of that evidence about costs makes his calculation a net income calculation. It just happens here because of the nature of this business that his gross products, but there's just nothing conclusory about the testimony that he gave. He is a business owner who had personal knowledge of all of his costs. He talked about every different category of costs that he could conceivably have that would be attributed here. And then with respect to the travel costs, testified that they were de minimis, which is just simply an adjective to describe a small amount of costs that he had never before calculated or allocated to any client. I'm going to defer to the chief here. All right. Well, I was just going to say, you know, de minimis has a legal dictionary definition. I'm not sure it has an accounting definition. And I guess the question here is what reasonable certainty of an accounting figure is what the court was trying to establish. And I guess, is your position de minimis? Is it zero or, you know, for? Your Honor, the dictionary describes it as small and insignificant. And I do think Mr. Sweet was using it here as a lay business owner. He wasn't using it to reach a legal conclusion. And of course, the jury isn't going to receive an instruction that mentions the word de minimis. But I think it was a wholly appropriate description to give a category of costs, again, that had never been allocated and that which he had personal knowledge to know weren't going to rise to any significant level, certainly relative to the amount of revenues that he had forecast here. And again, the summary judgment standard is you have to have evidence on an issue. And of course, his testimony is evidence. And at the end of the day, of course, we know that, in fact, these costs were de minimis. They were between, you know, 0.8 and 1.4% of his overall revenues. And I think that just illustrates that they were right in the realm of something that would not defeat a jury from finding that these lost profits were proved with a reasonable- Well, are we looking at a dispute of fact here, or are we looking at a legal requirement under Utah law? Well, I think the requirement under Utah law is that you have to establish your net lost profits, which includes putting forward evidence of what your costs are, which is exactly what Mr. Sweet did here. And I think to the extent, I mean, to put it in perspective- Well, you're saying in these kinds of cases that a plaintiff can just say, I didn't have any costs. And then sit down and say, really, what I want is this big number of damages without proving any costs. Your Honor, I think it very much depends on the nature of the business and the reasonable inferences to be drawn from the record. For example, if the plaintiff and Sunridge, a residential home builder, said, we have no costs, end of story, that's not enough to create a genuine issue of material fact for summary judgment. But for this type of business, in this context, with the business owner describing all these other types of costs, and then saying that there is this other little category of costs, but it's de minimis. And when you look at the entire big picture of all of the evidence on lost profits, that is certainly sufficient to get to a jury. Has the Utah Supreme Court told us that there's an exception for persons who have businesses that are run out of their homes? As your client? No, Your Honor, but I think the standard is you have to show the costs that you would incur to produce the future revenues. And that's the evidence that Mr. Sweet provided was all of those costs relevant to produce those future revenues. And you do have to look at the facts for the particular business that you have. And I'd like to reserve the remainder of my time for rebuttal. Before you do, I have a question. Isn't there a timing problem with that though? I mean, didn't he provide whatever costs he might have had after the decision was already made? Your Honor, the testimony before was that the costs were de minimis. And I think the district court fully recognized that, you know, where do you draw this line of putting a burden on a plaintiff to prove that a de minimis cost is de minimis? And the court acted like he would like to let him supplement. And then once the summary judgment ruling came down, he said, well, let me at least attempt to make this allocation and figure out what these costs are and then provided the evidence, the analysis. Chief, will you indulge me for a moment? So my next question is, is does the defense just have to accept that? So I say, I want to know all your costs and you say they're de minimis. And okay, I want all the information relating to your de minimis costs. And you say, well, they're just so small it wouldn't even justify producing them. And so does the defense just have to, do they have to eat that just because you've made a representation that they're that small? No, Your Honor. And in fact, the church could have asked for that specific information in this case. It just did not. It asked one question about travel costs at Mr. Sweet's deposition and asked nothing further. It didn't have a single interrogatory or document request or anything. All of that, his testimony could be challenged in front of a jury and he can be cross-examined about whether these costs are or aren't de minimis. But his testimony that they were de minimis in this context with this low cost business and with all the other evidence on the lost profits calculation was sufficient to clear the hurdle of reasonable certainty to get to a jury. Thank you. Thank you. Thank you, counsel. Your time's expired. Mr. Dushku. Yes, Alexander Dushku for the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints. And may it please the court and counsel. I think it's important with respect to the tortious interference claim to begin with bedrock Utah law. Under Utah law, there is no tort for inducing a breach by a proper means. And the Lee Furniture case is very, very strong on this. This is the granddaddy of all these cases. And here's what it says on page 309. I think this is very important for the court. Quote, a deliberate breach of contract, even we're employed to secure economic advantage is not by itself improper means. Because the law remedies breaches of contract with damages calculated to give the agreed party the benefit of the bargain, there is no need for an additional remedy in tort unless the defendant's conduct would constitute a tort independent of the contract. In other words, there is a right under Utah law to induce a breach of contract through proper means. Now, of course, improper means are not necessarily privileged. And the court has gone through and indicated the various kinds of things that can indicate an improper means. And one of those, it is true, is an industry standard that deals with the means by which a contract is breached and indicates that if there's an industry standard that says you can't breach in the following means, then that of course would be relevant to the tort. But the problem here is that a stanza is arguing not really that the church breached through an improper means, but that there are no proper means by which the church could breach. That there is an industry- Well, I thought the argument was that you have an exclusive contract here with two furniture suppliers and that the church inserted itself between the supplier and this plaintiff to say if you don't buy from us directly, you're not going to get any sales from us, period. Is that not an improper means? No, it is not because it is- Oh, wow. Well, Your Honor, our position is that you do have a right under Utah law to induce a breach of contract. You are able to say if we don't get the things that we need under, we don't get direct access, we don't get an opportunity to consult with you directly with respect to design and other kinds of features, then we're going to walk away. And that's not an improper means. Now, what they've asserted is that they have an industry standard that makes it improper no matter what. Basically, an improper means for them is any means. And that is just simply not Utah law. What would be an improper means? Well, any kind of coercion, any kind of defamation. Isn't it coercive to do what I just described? Buy from us directly or we're not buying anything? No, Your Honor. Not within the meaning of what Utah law is talking about. When Utah law is talking about coercion or some kind of an unlawful activity, that's not what it's talking about. And they haven't argued that this is coercive in that sense. What they're arguing is that there's an industry standard that says that you can't induce a breach, period, stop. And that simply cannot override the very nature of the tort. The very nature of the tort is you can induce a breach. You just can't do it through improper means. And Judge Briscoe, you mentioned earlier that these are not competitors, I think you said. The church is actually not in this industry. The church is in the faith industry. It's not in the furniture industry. It's a customer of the furniture industry. It's a very different posture. It's not a competitor. It is a customer. And a customer is able to ask questions like, hey, we want direct access. We want to be able to consult regarding design issues. A lot of what they're arguing was somehow terrible and inappropriate. I think it's important for the court to take a look at three documents that I think would help to kind of round out this dark narrative that has been presented and demonstrate that there really was nothing nefarious going on here. Not that it necessarily matters, but I think it's important just for the overall narrative. Take a look at Appendix Page 171, Appendix Page 216, and Appendix Page 163. 171, 216, and 163. Now, these are emails. Emails from JAMI, emails from CAOBA to Mr. Sweet and Estanza, and then an email from the church's representative to JAMI. Nowhere in there is there any indication that the church is trying to cut out Estanza from being able to get its commissions and its profits. That's not what the church was trying to do. It was trying to get direct access so that it could have an influence on design. This was an efficiency-based thing that it was seeking. And those companies repeatedly reaffirmed the right of Estanza to its commissions. Repeatedly reaffirmed that, which is appropriate. But they, after a point, stopped paying. Yes, they did. And that's a breach of contract. And Estanza did pursue an action against at least one of them for breach of contract. That's the appropriate remedy, of course. You can induce a breach. You are indicating the relationship of the parties here and saying that competition, disrupting competition, is not the point here. Is that right? Because I thought you had argued in your brief that that's something that we should consider. Well, we do believe this is an anti-competitive industry standard that you can't simply ever induce a breach between a manufacturer and a sales rep. We do believe that's anti-competitive. It's also contrary to the law. Because under Utah law, you can induce a breach by proper means. So the question is, was it somehow improper for the church just simply to ask for direct access? There's no case that remotely suggests that that is improper. No case involving a customer reaching out to a manufacturer, a producer, and saying, can we deal with you directly? And in any event, the church was not attempting to cut out a stanza from its commission. Utah case law on what proper means are? Certainly. The C.R. England case talks about it. And it indicates that we define improper means narrowly to include only those actions that are contrary to law, such as violations of statutes, regulations, or recognized common law rules, or actions that violate an established standard of its favor perfection. That's indicated. And then the court in Lee Furniture provided what the C.R. England court indicated was a non-exhaustive list of conduct that would constitute improper means. And I think it's important that non-exhaustive list inform this court's understanding of what an improper means be. Quote, violence, threats, or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falses. And the court goes on to say, such acts are illegal or tortious in themselves and are clearly improper means of interference. Now, of course, an industry standard can inform that analysis. We're not denying that. But you can't have an industry standard  because there is an absolute right under Utah law to induce a breach. The means just have to be appropriate. Why should the case at least go to trial and let the church can put on its competing experts and then see what a jury thinks? Well, I think this really is a matter of law. It's a matter of law because you have an industry standard that is attempting to, an alleged industry standard attempting to undo the right to breach, the right to induce a breach. And so regardless of what they come up with, even if we simply assume that their industry standard is accurate, it still doesn't undermine the fact that Utah law allows for a breach by proper means. Was the district court correct in its analysis of the industry standard when it got into the subjective objective discussion? I think the district court was taking a look at how amorphous this supposed industry standard is. I think it was mentioned earlier that, Judge Carson, that this is a fairly circular position that has been alleged. Well, I thought the point in the cases was to distinguish between an industry-wide standard versus a standard that is applicable, say, only to one company. And that really is the divining and dividing line between objective and subjective. And did the district court, when it looked at the Utah case law, did it apply it correctly? I think it was getting at the important point that what we have here is- Is that a no? Well, I think the court did not engage in a fulsome analysis of the entire question, Your Honor. So I think the word objective includes, is it clear? Is there something that actually meets a kind of rule of law standard? And it's not bringing in three experts who do have sometimes contradictory ways of describing things. We don't believe that rises to the level of a true objective standard, unlike in some of the other cases where there are written industry standards that clearly articulate- Well, are published standards required? They're not required. But they have the burden of showing that there is indeed an industry standard which deals with improper means in a way that is objective and in a way that is clear. This industry standard is nothing more than the resurrection of the rejected improper purpose prong under Utah law. So Utah law has rejected, in the context of tortious interference with contracts, an improper purpose analysis. And if you read through what these experts are saying, they're saying, look, it's perfectly fine to talk about direct access, to talk about all of these things, design issues and so forth. You just can't do it with the motive of cutting out the sales rep. That is just an improper purpose analysis. Mr. Pinion, actually one of their key experts, testified to this, a deposition question. Well, he was asked whether motives would be what would determine whether there's a violation of the industry standard. And the answer was, quote, yes, if they had the motive to cut the rep out in that discussion, then you hit a violation. That's appendix page 284, 284. That's a significant concession because that's the old improper purpose prong of this kind of analysis, which the court has repeatedly rejected the Eldridge case and the C.R. England case. Well, the documents, the email exchanges that you referred us to, wasn't that all about motive? Because your whole point in citing those is to say, well, the church never said that they wanted to cut out the plaintiff in any of their email exchange. Yeah, I think it shows what was truly going on here. And the most important purpose here is that these companies, there's a reason why we showed you those, is that these companies were reaffirming their contractual obligation to pay commissions. And we were not disputing that in any way. Our issue was something else. And something else that we were pursuing is not as a matter of law and improper means. Maybe I could just address very briefly the cost issue. Look, the bottom line here is the Utah law requires a showing of net loss profits. Those must be proven with reasonable certainty, and that includes a cost component. The church repeatedly asked a stanza for information and documentary evidence on costs, and it never got it. Let me give you some record sites for this because this is an important point of dispute. On page 231, these are interrogatory requests, 231 to 233, page 302 to 303, and then page 307 to 315. Now, what they did give was a declaration. Mr. Sweet provided a declaration. The declaration said, and this is on page 613, paragraph 91, the declaration said, I don't have any real office costs. And then it goes on to say, quote, although there were costs for travel specific to the LDS church or apportioned if the travel includes other business purposes, those costs were de minimis. These above stated costs have been included in my projections, end quote. That's all we got until after some rejection. We're basically saying my costs were zero, and that could be either accepted or rejected by the jury, I suppose, if they ever got to damages. Your Honor, I see that my time is about to expire. May I respond to your question? Yeah, go ahead. Okay. What they asserted was that their costs were de minimis. And I think what was mentioned earlier, the term de minimis is actually, you know, de minimis non curat lex. And the law does not concern itself with trifles. That is a legal conclusion. And it's de minimis compared with what? Compared with, you know, a de minimis in a billion dollar case is different than de minimis in $100,000 case. And in this case, what he admitted to having travel costs. We have a representative who is a sales rep who is in Colorado. We have a client that is in Salt Lake City. We have a manufacturer in Europe. We got another manufacturer in Central America and temples all over the world. And he says, we have only, we essentially have negligible costs of travel. We submit that's implausible. And in any event, the Utah Supreme Court in the Sawyers case, this is 722 P second 773 indicates that you just can't simply assert that you have no costs. Any other questions from the panel? I think your time's expired. And I'll give 60 seconds in rebuttal time to Ms. Stevenson since we took all of our time. Go ahead for 60 seconds. You need to unmute. There you go. Your Honor, if this case is resolved on the question of lost profits, it will be resolved on an unforeseeable technicality that we now know would be wrong on the merits. I want to emphasize it would be a really bad rule to say that any lost profits plaintiff has to, for any category, individual category of costs, where they say these costs are de minimis, they're tiny, to put on the burden of them to get past summary judgment, to prove and document that those costs in fact are tiny. That would be a terrible policy. It would be such an onerous burden on a plaintiff that would be fundamentally inconsistent with the reasonable certainty standard. And it would be inconsistent with Utah's policy that we don't let tortfeasors off the hook just because lost profits can be hard to prove with precision. Again, the standard here is not mathematical precision. We were talking about one tiny category, which this business owner testified to the gross magnitude of, and which of course was ultimately borne out and proven. Was your client deposed? Yes, Your Honor. And his costs were discussed in the deposition? They were, Your Honor. Thank you. All right, counsel, your time's expired. We appreciate the arguments. You're excused and the case shall be submitted.